IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>APPROXIMATELY $245,820 IN UNITED STATES CURRENCY SEIZED FROM ODELL HALL ON JANUARY 24, 2022, AT THE CHARLOTTE-DOUGLAS INTERNATIONAL AIRPORT | Civil No. 3:22cv248 |

## **VERIFIED COMPLAINT FOR FORFEITURE IN REM**

NOW COMES the United States of America, Plaintiff herein, by and through Dena J. King, United States Attorney for the Western District of North Carolina, in a civil cause of forfeiture, and respectfully states the following:

## INTRODUCTION

1. This is a civil action *in rem* against approximately $245,820 in United States currency seized from Odell Hall ("Hall") and Kervaughn Shepherd ("Shepherd") on January 24, 2022, at the Charlotte-Douglas International Airport (the "Currency").

2. The Currency was found rubber-banded and wrapped in towels—$206,820 in a bag checked by Hall and $39,000 in a bag checked by Shepherd—after a narcotics detection K9 alerted to Hall and Shepherd's checked bags. Separate narcotics detection canines later respectively alerted to both portions of the Currency in blind lineups of scent boxes.

1

3. Shepherd did not know the combination to the suitcase he had checked, and admitted he did not pack the suitcase, it was Hall's, and he was purportedly checking the suitcase for him so Hall did not have to pay a checked bag fee.

4. Hall claims he makes "a lot of money" as a day trader on Robinhood, and the Currency was comprised of his trading profits that he was taking to California to buy a high-end Range Rover.

5. The weight of the evidence, however, indicates that Hall and Shepherd were transporting cash that was the proceeds of narcotics transactions and/or intended to be used in narcotics transactions:

- Both Hall and Shepherd have felony drug trafficking convictions and were traveling to California without permission from U.S. Probation in violation of the terms of both their federal supervised release (*i.e.* probation).

- Indeed, Hall travelled at least **84 times** from September 2020 through January 2022, with 30 of those trips involving travel to or from California or Arizona (known drug source locations), spending $23,074 on airfare.

- Contrary to Hall's story of withdrawing the Currency in $20,000 increments over the course of months, he only withdrew $2,500 from his Robinhood account prior to the seizure, and his account has a withdrawal limit of $4,874.68. Moreover, Hall does not appear to be a particularly successful trader: in 2021 (the year prior to the January 2022 seizure), he suffered a ***net loss* of $6,637.52**.

- If Hall was traveling to California to purchase a Range Rover, it makes little sense to withdraw the money from his bank account as he claimed (notably, Hall could not provide proof of any bank withdrawals at the time of seizure or to date) and then risk carrying it in cash form across the country to pay for the vehicle—indeed, even under the story that Hall gave law enforcement, the vehicle's seller asked that the money be wired. *See, e.g., United States v. $183,791.00 in U.S. Currency*, 391 Fed. Appx. 791, 795 (11th Cir. 2010) ("Although a large amount of cash alone is insufficient to meet the government's burden, it is highly probative of

2
Case 3:22-cv-00248-RJC-DSC   Document 1   Filed 05/31/22   Page 2 of 17

a connection to some illegal activity . . . legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages in a backpack . . . because there are better, safer means of transporting cash if one is not trying to hide it from the authorities. In contrast, drug rings do often utilize couriers to transport large amounts of cash in rubber-banded bundles.") (internal quotations and citations omitted).

6. Thus, the Currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it constitutes money furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, is proceeds traceable to such an exchange, and is money used or intended to be used to facilitate a violation of 21 U.S.C. §§ 841 and/or 846.

7. Procedures for this action are mandated by 21 U.S.C. § 881, 18 U.S.C. § 983, 19 U.S.C. §§ 1602-1621, and, to the extent applicable, the Federal Rules of Civil Procedure and accompanying Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 and 1355. These statutes confer original jurisdiction to federal district courts of all civil actions, suits, or proceedings commenced by the United States and any action for the forfeiture of property incurred under any act of Congress.

9. Venue is proper pursuant to 28 U.S.C. § 1395 because the Currency was seized in the Western District of North Carolina.

10. The Currency has been seized and is now within the Western District of North Carolina.

11. Based on the following facts, verified by Department of Homeland Security, Homeland Security Investigations ("HSI") Special Agent ("SA") Daniel Leal, this action seeks the forfeiture of all right, title, and interest in the Currency.

## FACTS GIVING RISE TO FORFEITURE

*Hall and Shepherd's relevant criminal history*

12. Hall was federally convicted (guilty plea) of violations of 21 U.S.C. §§ 846 and 841(a)(1), Conspiracy to Possess with Intent to Distribute Marijuana (a Class C Felony) and 18 U.S.C. § 1956(h), Conspiracy to Launder Monetary Instruments) (a Class C Felony).

13. Hall was sentenced on December 4, 2018, to eighteen (18) months imprisonment on each count (to run concurrently), and three years of supervised release (also concurrent on each count). *See United States v. O'Dell Kirk Hall*, Case No. CR-18-00485-002-PHX-DGC in the United States District Court for the District of Arizona.

14. Shepherd was convicted (guilty plea) of a violation of 21 U.S.C. §§ 846 and 841(b)(1)(A), Conspiracy to Distribute Cocaine Hydrochloride, Heroin, and Marijuana.

15. Shepherd was sentenced on November 28, 2012 to 148 months imprisonment (later reduced to 126) and five years of supervised release. Additionally, a forfeiture money judgment of $1 million was ordered against Shepherd, this sum being the proceeds of his criminal activity. *See United States v. Kervaughn Evans Shepherd, et. al*, Case No. 1:12-cr-76-1 in the United States District

Court for the Middle District of North Carolina.

16. United States Probation confirmed that both Hall and Shepherd were on supervised release at the time of the travel underlying the seizure and were each traveling in violation of the terms of their supervised release, as neither had permission to travel to California (required as a condition of their probation).

*The interdiction*

17. On January 24, 2022, law enforcement at the Charlotte airport was conducting a narcotics interdiction operation on outbound domestic flights to known drug-source locations, which included American Airlines ("AA") flight 1871 bound for Los Angeles, CA.

18. That day, Hall and Shepherd were traveling to Los Angeles on AA flight 1871.

19. The interdiction operation included, among other things, the deployment of K9 Cali, a properly trained and certified narcotics detection canine, to conduct open-air sniffs of checked suitcases prior to their being loaded onto AA flight 1871.

20. K9 Cali alerted to three suitcases in three separate lineups of bags pulled from a luggage cart: two suitcases belonging to Hall and one suitcase belonging to Shepherd.

21. The suitcases were detained and moved to the boarding area of gate C15.

*The $206,820 seized from Hall's suitcases*

22. HSI Task Force Officer ("TFO") Cerdan had Hall paged by the gate agent

as the passengers were beginning to board the plane. TFO Cerdan asked Hall to speak with him about his two checked bags as he approached, and they stepped aside to a hallway just to the side of the gate desk.

23. Hall confirmed to TFO Cerdan that the suitcases belonged to him.

24. TFO Cerdan advised Hall that a narcotics K9 alerted to the odor of narcotics on the suitcases. TFO asked Hall if he used narcotics or had been around anyone that did so, and Hall responded "No, not at all."

25. TFO Cerdan asked Hall if he packed the suitcases himself and Hall responded, "yes."

26. Hall gave TFO Cerdan a New York license for identification, but stated he lived in the Charlotte area.

27. Hall confirmed that he packed the suitcases himself.

28. TFO Cerdan asked Hall if he could search the suitcases for narcotics and Hall gave him consent. Cerdan asked Hall to unlock the combination zipper locks and Hall did so.

29. TFO Cerdan asked Hall if there were any valuables that may break when he opened the suitcase, Hall said, "no valuables that's going to break," and when TFO Cerdan asked what valuables were inside, Hall responded "just go ahead and check."

30. TFO Cerdan opened the black suitcase and observed new dryer sheets and a single blanket with a large bulge.

31. Dryer sheets are often used by drug or money couriers in attempts to

mask odors from drug detection canines.

32. Hall advised that the bulge was money, around "$30,000." TFO Cerdan continued his search of the suitcase and found multiple towels with cash inside:





33. TFO Cerdan asked Hall when he purchased his ticket and Hall responded "yesterday."

34. TFO Cerdan asked Hall about the purpose of his travel. Hall responded it was to purchase a Range Rover Autobiography, which, according to Hall, was top-of-the-line sports utility vehicle. Hall explained that he was buying it pre-owned, a 2019 model costing $165,000.

35. Hall told TFO Cerdan that he was a day trader on Robinhood, trading options, that the money came from a bank, and the money in the suitcase totaled about $170,000. Hall said that when he options traded, he would take out his profits and put them into his savings account.

36. TFO Cerdan asked Hall to show him on any phone app (Hall had his phone in his hand during the conversation) evidence that he withdrew the money.

37. Hall then said that he withdrawn out about $20,000 a month for 7 or 8 months to purchase the vehicle, and added that he makes a lot of money.

38. At this point, as Hall had his phone out in front of him, TFO Cerdan noticed that Hall had an open phone call going during the encounter. When asked if he was on a call and who with, Hall stated his "my friend." TFO Cerdan told Hall that he might want to pay attention to the questions being asked, and explained the reason why he was asking Hall financial questions.

39. When TFO Cerdan noted that travelers generally did not carry that much cash in their suitcases, Hall stated that he had a discussion with the [vehicle's] "broker" who wanted him to wire the money, but Hall told the broker "I don't have it in my account, I could just bring it [] in cash." Hall then repeated he told the broker that he could not wire the money to him, but could bring it to him in cash. Hall claims

the purported broker agreed to this.

40. TFO Cerdan further noted the cash appeared to consist of a lot of twenty-dollar bills and was rubber-banded, indicating it did not come from a bank.

41. Hall said it did, but he took off the bank bands and repacked it himself as it was (rubber banded).

42. At this point, TFO Bynoe approached Hall, showed him the bag associated with Shepherd, and said, "Sir, do you have the combination for your bag?" Hall gave TFO Bynoe the combination to the suitcase. Hall stated he was traveling by himself. *See* Paragraph 66 below.

43. Hall then showed TFO Cerdan his phone and said that he was actually in a trade as they spoke, valued at "a thousand dollars."

44. When asked how long he was going to be out in LA, Hall stated he was going to put the purchased vehicle on a train and come right back.

45. TFO Cerdan (again) asked Hall if anyone would have his bag with their name on it, and Hall reiterated that he was travelling by himself.

46. When asked if he had a criminal history, Hall immediately and unequivocally stated "no." As detailed above at Paragraphs 12-13, this was a lie. *See* 18 U.S.C. § 1001.

47. Then, when asked if he had ever been arrested, cited, or had any type of police contact, Hall responded with he was "trying to pull up my Bank of America, but for some odd reason..."

48. When an airline employee came into the jetway, TFO Cerdan told Hall

that if he wanted to get on his flight, Hall should just let him know any time, and that Hall was not being detained. Hall indicated he understand and that TFO Cerdan was just doing his job and it was "completely fine." TFO Cerdan then told Hall the airline had confirmed he had nine minutes if he wanted to get on the plane.

49. Hall continued to indicate that he could not log into his Bank of America account.

50. TFO Cerdan asked if Hall if he paid taxes on his day trading, to which Hall replied that he was going to start this year, but had been day trading for 18 months. Hall stated that prior to day trading, he worked for a cleaning company in New York.

51. Hall said he had been living in North Carolina for seven months and had been day trading that whole time (with no other jobs in NC). Hall did not know the zip code for his North Carolina address.

52. TFO Cerdan asked Hall if he knew "that man over there," pointing to Shepherd.

53. Hall stated that he did not.

54. TFO Cerdan stated he was asking "because you gave the combination to his suitcase," which Hall had also said was his.

55. TFO Cerdan pointed out the incongruity of those statements with Hall's prior answers that he was not traveling with anyone and that he did not know Shepherd.

56. When asked whose money was in the other bag, Hall stated it was "my

10
Case 3:22-cv-00248-RJC-DSC   Document 1   Filed 05/31/22   Page 10 of 17

money."

57. TFO Cerdan advised Hall that he was seizing the currency for further investigation and explained the process for providing documentation and gave him a seizure receipt. TFO Cerdan also confirmed that Shepherd had indicated the money in his suitcase was Hall's.

### *The $39,000 in Currency from Shepherd's suitcase*

58. SA Leal and TFO Bynoe likewise made contact with Shepherd in the gate area.

59. After being advised of the K9 alert to the suitcase, Shepherd claimed ownership of it and granted consent to search.

60. Shepherd was asked for the combination to the suitcase's lock and stated he did not know.

61. When questioned about why he did not have the combination for his own bag, Shepherd stated he was asked to check the bag for a friend.

62. When asked what his friend's name was, Shepherd indicated he was travelling with Hall.

63. Shepherd then confirmed that he did not pack the bag, and didn't have the combination, but he thought that Hall "should."

64. When asked if he had ever been charged with a narcotics related crime, Shepherd stated he had for "conspiracy" a long time ago.

65. Shepherd told the law enforcement officers that there was no narcotics in the bag, and it only contained clothes.

66. At this point, TFO Bynoe took the bag over to Hall, who gave the combination for the bag.

67. TFO Bynoe then opened the bag, and located cash wrapped in towels:



68. Shepherd was asked if he had any more cash on him and initially denied having any. Upon follow up questions, Shepherd also stated he had a thousand dollars, then later about fifteen hundred dollars of his own money, but denied that this was the fee he was paid to transport the currency in the suitcase.

69. Shepherd claimed he checked the bag for Hall because he was travelling first class and did not have a checked bag fee.

70. The currency was seized and Shepherd was given a receipt and had the seizure process explained to him.

*The second K9 alert and Currency's deposit*

71. The $206,820 in Currency was then placed in a blind lineup of four scent

boxes and presented to K9 Benny, a properly trained and certified narcotics detection canine.

72. K9 Benny alerted to the odor of narcotics in the scent box which contained the $206,820 in Currency.

73. The $206,820 in Currency was transported to Loomis, where it was counted and found to total $206,820, consisting of 61 one hundred-dollar bills, 10 fifty-dollar bills, 9,957 twenty-dollar bills, 104 ten-dollar bills and 8 five-dollar bills—a composition more consistent with the proceeds of street-level narcotics sales rather than money withdrawn from a bank.

74. The $39,000 in Currency was also placed in a blind lineup of scent boxes, and K9 Lily, a properly trained and certified narcotics detection canine, alerted to the odor of narcotics on the scent box containing the $39,000 in Currency.

75. The $39,000 in Currency was transported to Loomis, where it was counted and found to total $39,000, in denominations of 1,949 twenty-dollar bills and two ten-dollar bills, likewise more consistent with the proceeds of street level narcotics transactions than money withdrawn from a bank.

76. The Currency was deposited into an account established to hold seized funds.

### *Hall's lack of legitimate income*

77. To date, Hall has not submitted any documentation of legitimate income or documentation supporting the source of or the intended use for the $206,820 seized.

78. Hall has no known reported legitimate sources of income in the state of North Carolina.

79. Hall's purported occupation as a Robinhood day trader likewise lends no credible support to the Currency being legitimately derived.

80. Hall's Robinhood Account that was created on January 27, 2021, and the employment status on his account lists Hall as "unemployed."

81. Contrary to Hall's assertions regarding large withdrawals of around $20,000, the Hall's account has a withdrawal limit of $4,874.68. And Robinhood's records indicate that Hall only withdrew $2,500 from his account prior to the January 24, 2022 seizure, contradicting Hall's account that the Currency was comprised of withdrawn day trading profits.

82. Nor does Hall even appear to be a profitable trader: in 2021, he had a *net loss* of $6,637.52.

*Hall's travel history*

83. From September 2020 through January 2022, Hall traveled at least 84 times on Delta, Southwest, or American Airlines. Of these flights, at least 30 flights involved travel to or from California or Arizona (known drug source states)—a travel pattern consistent with transporting drugs or illicit proceeds. And on at least 10 occasions, Hall returned to the east coast only two days or less after arriving in California or Arizona. Most of the travel involved one way tickets purchased the day of or one to two days prior to the date of travel. During this time, Hall spent approximately $23,074 on the purchase of airline tickets.

## FIRST CLAIM FOR RELIEF – THE CURRENCY
## (21 U.S.C § 881(a)(6))

84. The United States incorporates by reference the allegations set forth in Paragraphs 1 to 83 above as if fully set forth herein.

85. The Currency is subject to forfeiture pursuant to 21 U.S.C. § 881 (a)(6) because it constitutes money furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, is proceeds traceable to such an exchange, and is money used or intended to be used to facilitate a violation of 21 U.S.C. §§ 841 and/or 846.

86. Upon information and belief, the following persons may claim an interest in the Currency seized on January 24, 2022:

- Odell Hall

- Kervaughn Shepherd

- With courtesy copy to: Tsigler Law, 299 Broadway, Suite 1400, New York, New York 10007

## CONCLUSION AND PRAYER FOR RELIEF

87. By virtue of the foregoing, all right, title, and interest in the Currency vested in the United States at the time of the commissions of the unlawful act giving rise to forfeiture, 21 U.S.C. § 881(h), and has become and is forfeitable to the United States.

WHEREFORE, the United States of America respectfully prays the Court that:

1. A warrant for the arrest of the Currency be purchased;

2. Due notice be given to all parties to appear and show cause why the forfeiture should not be decreed;

15
Case 3:22-cv-00248-RJC-DSC   Document 1   Filed 05/31/22   Page 15 of 17

3. Judgment be entered declaring the Currency to be condemned and forfeited to the United States of America for disposition according to law; and

4. The United States be granted such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action, including but not limited to the expenses of maintenance and protection of the Currency as required by 28 U.S.C. § 1921.

Respectfully submitted this 31st day of May 2022.

> DENA J. KING
> UNITED STATES ATTORNEY
>
> /s/ Seth Johnson
> J. Seth Johnson
> NC Bar No. 53217
> Assistant United States Attorney
> 227 West Trade Street, Suite 1650
> Charlotte, North Carolina 28202
> Telephone: (704) 338-3159
> Email: seth.johnson@usdoj.gov

## **VERIFICATION**

I declare under penalty of perjury that the factual information contained in the foregoing Complaint is true and correct according to the best of my knowledge, information, and belief.

Executed on the 31st day of May, 2022.

                                        Special Agent Daniel Leal
                                        Department of Homeland Security,
                                        Homeland Security Investigations